* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and amend the opinion and award. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The parties were subject to the provisions of the North Carolina Workers' Compensation Act at the time of plaintiff's injury. An employee-employer relationship existed between plaintiff and defendant-employer at that time.
4. Clarendon National Insurance Company was the carrier on the risk at all relevant times. *Page 3 
5. Employee sustained compensable bilateral hand injuries while she worked for defendant-employer on January 29, 2002. On February 11, 2002, defendants accepted this claim pursuant to the Form 60 filed in this claim.
6. Plaintiff's average weekly wage is $432.25, which yields a compensation rate of $228.18.
 * * * * * * * * * * * EVIDENCE
1. The parties stipulated into evidence the following exhibits:
 a. Stipulated Exhibit 1: The parties' Pre-Trial Agreement dated June 1, 2005
 b. Stipulated Exhibit 2: Industrial Commission forms and filings, medical records, and rehabilitation reports, submitted after the hearing before the Deputy Commissioner
2. The following individuals testified at the hearing before the Deputy Commissioner:
 a. Teresa A. Harris
 b. Patricia King Spain
3. The following deposition was received into evidence following the hearing before the Deputy Commissioner:
 a. Lawrence Scott Levin, M.D.
 * * * * * * * * * * *
Based upon all the competent evidence of record and the reasonable inferences arising therefrom, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Plaintiff, who at the time of the hearing before the Deputy Commissioner was forty-six years old and a high-school graduate, began working for defendant-employer in January 2001 as a quality assurance inspector. The company packed chicken parts for a number of different customers. Plaintiff's job involved inspecting the machinery for cleanliness, checking product quality during production, and preparing reports with her findings. She would look for problems with the temperature of the meat, with the fat content, with bone fragments in boneless cuts of chicken, and with other requirements specified by the government or the customer involved.
2. On January 29, 2002, plaintiff sustained a compensable injury by accident. She reached to push the button to stop the wing machine and her right hand slipped into the machine, which cut off her right little and ring fingers and lacerated her middle finger. She apparently reached into the machine for her injured hand with her left hand, and the machine caused severe lacerations to the little and index fingers of her left hand. Following the injury, she was taken to the local emergency room where the amputated digits were wrapped and packed in cold saline and her hands her bandaged. The emergency room physician then transferred her to Duke Medical Center under the care of Dr. Lawrence Scott Levin, an orthopedic and plastic hand surgeon.
3. Once at Duke, plaintiff was immediately taken to the operating room where Dr. Levin assessed her hands and concluded that the amputated digits could be reattached. He then performed surgery to re-implant the severed fingers and to repair the lacerated tendons and nerves in both hands. On February 6, 2002, he discharged plaintiff from the hospital with splints on her injured fingers. *Page 5 
4. Following the initial operation, plaintiff had to undergo a series of reconstructive surgeries as Dr. Levin addressed the various issues that presented with her fingers. On March 20, 2002, a pin was removed from her right little finger and a tendon was grafted into her left little finger. After a period of therapy and casting, Dr. Levin performed surgery on October 23, 2002, to reposition the bone in plaintiff's right little finger. Since plaintiff could not bend her left little finger, Dr. Levin next performed two operations in January and March 2003 to insert an artificial tendon into that finger. Dr. Levin then addressed the limitation of motion in plaintiff's right ring finger by performing surgery in July and August 2003 to remove hardware inserted during the first operation, which was causing plaintiff pain, and to reconstruct a flexor tendon. After those procedures, plaintiff had more hand therapy, and by October 2003 was able to flex all of her injured fingers, although she did not have full range of motion. Dr. Levin instructed plaintiff to wear a ring on her right ring finger in order to help the tendon pull the finger down.
5. When Dr. Levin evaluated plaintiff on November 21, 2003, she had regained good range of motion, especially considering the severity of her injuries. Dr. Levin ordered computerized testing to evaluate plaintiff's permanent impairment and released her from medical care, although he did see her once more on December 21, 2003.
6. Defendants admitted liability for benefits under the Workers' Compensation Act for plaintiff's injury pursuant to a Form 60 Admission of Employee's Right to Compensation, and paid compensation to plaintiff throughout the time she was treated by Dr. Levin. When Dr. Levin released her, he indicated that plaintiff could drive and could do light-duty work. He restricted the amount of weight she could handle, restricted her from prolonged exposure to cold, and indicated that he did not want her having to balance herself on slippery surfaces. With these restrictions, plaintiff could not return to her former job as a quality assurance technician. *Page 6 
7. At the time of her injury in January 2002, plaintiff had been working the night shift while living with her mother and her thirteen-year-old daughter. Plaintiff testified that she had chosen the night shift so that she could be home during the day to watch out for her mother who had Alzheimer's disease, and to transport her daughter to school and other functions. In fact, plaintiff had left a better-paying job to work for defendant-employer in 2001 precisely because defendant-employer had a night-shift position available.
8. Despite plaintiff's testimony concerning her mother's Alzheimer's disease, the stipulated evidence before the Full Commission include a note in the records of plaintiff's nurse case manager, from just days after plaintiff's release from the hospital in February 2002, mentioning that plaintiff had a home health aid during the day "while her mother and daughter are at work and school." The evidence before the Full Commission includes no other references to plaintiff's mother working or otherwise able to function on her own during the day, and plaintiff's nurse case manager did not testify before the Deputy Commissioner. The Full Commission finds that the suggestion that plaintiff's mother worked during the day, as contained in the nurse case manager's note, is unsupported by any other evidence of record and is therefore entitled to reduced weight of consideration. Accordingly, the Full Commission finds, based on the greater weight of the evidence before it, that at the time of plaintiff's injury plaintiff's mother had Alzheimer's disease, and required plaintiff's care during the day.
9. The Full Commission finds, based on the greater weight of the evidence before it, that plaintiff's daughter continued to require transportation to school and to other events, and that plaintiff's mother continued to require daytime care due to her Alzheimer's disease, at the time Dr. Levin released plaintiff from medical care at the end of 2003 and throughout the following months. *Page 7 
10. Soon after plaintiff was released from Dr. Levin's medical care, the case manager assigned to plaintiff's claim sent a job description to Dr. Levin describing a clerical position with defendant-employer under defendant-employer's quality assurance director, Teresa Harris, which involved working with compiling reports from the daily findings of the quality assurance technicians, filing their paperwork, and filling in for the receptionist during breaks and lunch. The job paid $8.20 per hour. The employee performing the job would work from 6:00 a.m. to 3:00 p.m. in a heated office. Although the position required some use of a computer to enter numbers into spreadsheets, defendant-employer was willing to train plaintiff on how to do the job. Dr. Levin approved of the job description for plaintiff. Plaintiff was then offered the job by letter dated February 6, 2004, and she was asked to report for work on February 16. However, plaintiff declined the position.
11. Following plaintiff's decline of the clerical position, defendants filed a Form 24 Application to Terminate or Suspend Payment of Compensation on the basis of plaintiff's allegedly unjustified refusal of employment suitable to her capacity. Following the denial of the Form 24 by the Industrial Commission, defendants filed a Form 33 Request for Hearing appealing the denial of the Form 24.
12. According to the evidence before the Full Commission, plaintiff's position with defendant-employer at the time of her injury, as a quality assurance technician, paid her $8.25 per hour, more than the $8.20 per hour offered by defendant-employer for the clerical position. Plaintiff had further supplemented her pre-injury income with significant overtime work. However, when a previous employee in the clerical position had sought overtime work, she had been rotated into production line work as a quality assurance technician during the weekends, precisely the type of work plaintiff was no longer able to perform following her injury. In fact, *Page 8 
the clerical position, as offered to plaintiff, was expressly modified to eliminate any need for such production line work by plaintiff:
 The only change that will be made to this position is that the previous employee was required to rotate weekends in the production area with the other QA techs. Due to her limitations in lifting and inability to tolerate the cold, Ms. Spain will not be asked to do this. She may have to work weekends, but it will be the same job she performed during the week.
It follows that defendants have failed to demonstrate that the clerical position offered to plaintiff would provide her with the capacity to earn the wages which she was receiving at the time of her injury.
13. Furthermore, while there was no evidence that the clerical position was created specifically for plaintiff, the evidence shows that it was established by defendant-employer in February 2002, shortly after plaintiff was first released from the hospital following her workplace injury. Once the clerical position was established, it was staffed variously through a temporary services agency and by four different "permanent" employees between February 2002 and December 15, 2003, after which time it was "held open" for plaintiff pending resolution of her workers' compensation claim. At the time of the hearing before the Deputy Commissioner in May 2006, the position was held by an employee on light-duty due to a work-related knee injury, with additional assistance being provided by the plant manager, the day shift superintendent, and the four people staffing the accounting department. Although Ms. Harris testified before the Deputy Commissioner that the clerical position was a "permanent" position with opportunity for advancement, and that it had been advertised as such in local newspapers, the Full Commission finds that the position has been staffed by defendant-employer since its creation only as a temporary position, and therefore that defendants have not shown the position *Page 9 
to be representative of employment that might otherwise be available to plaintiff in the competitive marketplace.
14. The Full Commission finds, in its opinion and based on the greater weight of the evidence, that even if the duties of the clerical position offered by defendant-employer are suitable to plaintiff's post-injury physical and vocational capacity, plaintiff's refusal of the position is justified on the basis of (a) plaintiff's need to work a night-shift job so that she can be home during the day to care for her mother and provide transportation for her daughter; (b) defendants' failure to show that the clerical position will provide plaintiff with the capacity to earn the wages which she was receiving at the time of her injury, particularly in light of any changes in the requirements of the position due to plaintiff's work-related injury; and (c) defendants' failure to show that the clerical position will be treated in the future as a permanent position with opportunities for advancement akin to those of plaintiff's former position with defendant-employer, and representative of employment available to plaintiff in the competitive marketplace
15. Because the Full Commission finds plaintiff's refusal of the clerical position to have been justified, the Commission need not, and does not, make any finding concerning whether the proffered position was suitable to plaintiff's post-injury capacity.
16. The Full Commission finds, based on the greater weight of the evidence before it, that plaintiff is not permanently and totally disabled as of the date of the hearing before the Deputy Commissioner. The greater weight of the evidence shows that plaintiff continued to sustain temporary total disability as of the date of hearing before the Deputy Commissioner.
 * * * * * * * * * * * *Page 10 
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff was justified in refusing the clerical position offered to plaintiff by defendant-employer on February 6, 2004. See Lowery v.Duke University, 167 N.C.App. 714, 718-19, 609 S.E.2d 780, 783 (2005); N.C. Gen. Stat. § 97-32.
2. Defendants termination or suspension of plaintiff's disability benefits was inappropriate in light of plaintiff's justified refusal of the clerical position. It follows that the denial of defendants' Form 24 was appropriate. N.C. Gen. Stat. §§ 97-32, 97-18.1.
3. Because defendants' Form 24 Application to Terminate or Suspend Payment of Compensation was denied, plaintiff is entitled to continuing temporary total disability compensation of $288.18 per week until further order of the Commission. N.C. Gen. Stat. § 97-29.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. The Administrative Decision and Order filed June 3, 2004, is hereby AFFIRMED.
2. Defendants shall pay to plaintiff continuing temporary total disability compensation of $288.18 per week, subject to the attorneys' fee provided herein. Any compensation that has accrued shall be paid to plaintiff in a lump sum. *Page 11 
3. Defendants shall pay directly to plaintiff's counsel a reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded to plaintiff herein. Fees based upon compensation that has accrued shall be paid to plaintiff's counsel in a lump sum; thereafter, plaintiff's counsel shall receive every fourth check of compensation due plaintiff.
4. Defendants shall pay the costs.
This 27th day of March 2007.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ LAURA K. MAVRETIC COMMISSIONER
 UNAVAILABLE FOR SIGNATURE: THOMAS J. BOLCH COMMISSIONER *Page 1